[redacted]

David E. HUGHLEY

v.

MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION.

Civ. No. Y-85-4646.

United States District Court, D. Maryland.

Aug. 13, 1987.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

John I. Heise, Jr. and John P. Rhody, Jr., Silver Spring, Md., for plaintiff.

Arthur S. Drea, Jr., General Counsel and D.S. Sastri, Associate General Counsel, Hyattsville, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

David E. Hughley, a former employee of the Maryland-National Capital Park and Planning Commission, filed suit against the Commission under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that his discharge was caused by racial discrimination. The gravamen of his complaint is that he was fired for not completing mounted police training, whereas white employees were permitted to transfer out of mounted training rather than suffer termination. This matter came before the Court for trial without a jury. Having heard the evidence adduced and the arguments of counsel, the Court makes the following finds of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff Hughley is a black male citizen of the United States. Defendant Maryland-National Capital Park and Planning Commission ("the Commission") is an employer subject to Title VII. 42 U.S.C. § 2000e(b). The Commission is responsible for park development, planning and zoning within those portions of Prince George's and Montgomery Counties adjoining the District of Columbia. The Maryland-National Capital Park Police is an agency of the Commission.

Plaintiff applied for a job with the Commission Park Police in the fall of 1981. He initially interviewed with Officer Fred Keeney, who described the nature of the position and the duties involved. At this interview, Officer Keeney gave plaintiff a document that included a description of the mounted police as a special operation within the Park Police. Plaintiff's Exhibit 2 at 2.

In June 1982, plaintiff appeared before a panel for his formal interview. The oral review board consisted of LeRoy J. Hedgepeth, Personnel Manager; Lt. Col. Donald R. Leslie, Sr., Division Commander, Prince George's County; and Lt. Col. Joseph R. Robertson, Division Commander, Montgomery County. Officer Keeney was present, but he asked no questions. Plaintiff testified that the board members presented the mounted unit as an optional position to aspire to, and he told them he had little knowledge of horses, but he had no problem with them. Plaintiff claims that the

board did not inform him that mounted training was required. Both Officer Keeney and LeRoy Hedgepeth testified that Lt. Col. Robertson asked plaintiff if he were aware that he may be required to ride a horse, motor scooter, drive a patrol car, or do foot patrol, and Hughley responded that he had no problem with that.

Plaintiff was hired as a Park Police Officer Candidate by letter dated August 9, 1982. The letter stated that career status would be granted once plaintiff had successfully completed Candidate Training School and twelve months thereafter as an Officer Candidate. Hughley reported for duty on August 23, 1982, and initially worked in the Communications Section of the Park Police. During this assignment, plaintiff was considered an excellent and cooperative employee.

Plaintiff entered the basic training course at Prince George's County Police Academy on November 22, 1982. While at the academy, plaintiff received two documents describing the specifications for a Park Police Officer Candidate and a Park Police Officer I. Examples of duties for a Park Police Officer Candidate generally included attending assigned classes and performing related duties to familiarize the candidate with Park Police procedures. Plaintiff's Exhibit 18. Examples of duties for a Park Police Officer I, the position that candidates achieve after successfully completing their probationary year, included "patrols an assigned beat in a patrol car, motorcycle, or on horseback, or on foot." Plaintiff's Exhibit 19. Because the document described mounted patrol as an example of a duty, plaintiff contends that the ability to ride a horse is not a requirement for becoming a Park Police Officer I. Indeed, horseback training is not listed as a required skill on either document. Captain George Klotz, Special Operations Commander in charge of all training, testified that these job specifications, adopted in 1979, made mounted training mandatory if an individual was assigned to it. No officer assigned to mounted training who had been hired after 1979 was excused from such training except for medical reasons.

Hughley's conduct and test scores at the police academy were exemplary, although he was reprimanded with loss of one day's pay for arriving at work with alcohol on his breath.[1] Park Police Officer Candidates Daniel Bryant, Edward Kilpatrick, Daniel McNickle, Gordon Norwood and Richard Wright were also enrolled in plaintiff's basic training course. The candidates successfully completed the course in April 1983, whereupon plaintiff, Norwood and McNickle were assigned to patrol field training, and Bryant, Kilpatrick and Wright were assigned to mounted horse training. Plaintiff's Exhibit 6.

Officer Larry Brownlee supervised plaintiff during patrol field training. Plaintiff and Officer Brownlee reported to Acting Lieutenant Michael Nisson and to Sergeant J. Smith. Plaintiff satisfactorily completed patrol field training, whereupon he was ordered to report for mounted training beginning August 15, 1983. Prior to this order, plaintiff had requested that he not be assigned to such training because he had no love for horses and he would be uncomfortable in the position. Plaintiff's Exhibit 7. Acting Lieutenant Nisson empathized with plaintiff. Nisson concurred that plaintiff should not be forced to take mounted training because he did not want to lose Hughley to the mounted unit, and because he feared the liability that might arise if Hughley sustained injuries during mounted training. Plaintiff's request was denied by Captain Klotz, who, plaintiff testified, told Hughley that he was required to undertake mounted training and that plaintiff should put forth a good faith effort.

Captain Klotz testified that at the time plaintiff's class graduated from the academy, the mounted police section had seven vacancies. He decided to train twelve people for the mounted unit to fill the seven slots and assure reserves. Six tenured officers volunteered, and Klotz recruited the

---

1. Plaintiff testified that he went drinking the previous night after being told he could not see his daughter on Christmas. Plaintiff did not shower before work the next day for fear of arriving late. He had drunk nothing that morning, and he passed a sobriety test at work.

six academy graduates. Klotz established two mounted training classes of six persons each, placing three recruits and three tenured officers in each training class. Thus, half the police officer candidates were assigned to mounted training upon graduation, and the other half to field training. When the first mounted training class ended, the police officer candidates switched. Those initially assigned to field patrol, as was plaintiff, reported to mounted training, and the others undertook field training.

Hughley reported to mounted training on August 15, 1983 as ordered. Police officer candidates Gordon Norwood and Daniel McNickle were in his class, as were tenured officers Richard Gaither, John Hudock, and Sheri Sholl. Plaintiff and the others received a training booklet, which read in part:

A. Introduction: Welcome, as a new member of the Mounted Unit we wish you luck during the 90 day training period in which you are about to partake. If at any time during your training you wish to stop and return to your previous position, please do so, as there will be no hard feelings. We only want officers that are genuinely interested in riding.
B. Responsibilities of Recruit:
1. Follow instructions to the letter; the training officer is in charge at all times.
2. Put forth your best efforts, things will not come easily, you must work to become a good rider.

Plaintiff's Exhibit 9 at 2. Plaintiff interpreted this language to mean that if anyone wanted to leave, they could, and he testified that Klotz made a statement to this effect. Klotz testified that the training booklet had not been revised after the 1979 job specifications were issued. At mounted training orientation, he told the class that those who had been hired prior to the 1979 job specifications could follow paragraph A of the booklet, and all the others were required to complete mounted training. Sergeant Michael Wynnyk, who taught plaintiff's mounted class, testified that he heard Captain Klotz tell the officers that only the volunteers had the option of leaving, and the police officer candidates must complete mounted training.

The trainees began riding the next day, and plaintiff continued riding for roughly a week. Hughley testified that he experienced a queasy feeling and stomach cramps, and he took sick leave. He saw two doctors at an emergency room, and visited his personal physician, Dr. Ann Williams, on August 28, 1983 for muscle spasms, and on September 6, 1983 for nausea and stomach cramps. Hughley missed twelve days of training between August 22 and September 29, 1983. Plaintiff submitted two medical reports from Dr. Williams to the Park Police, dated September 7 and October 19, 1983, recommending that plaintiff be reassigned to work other than mounted training "because of the development of extreme anxiety with associated physical symptoms every time he is around horses. Although this possibly could be treated, the patient would not be a good candidate for treatment as he is not motivated to pursue it." Plaintiff's Exhibit 10.

Because plaintiff's physician determined that his condition might be treatable, defendant directed Hughley to see Dr. Michael McDermott, a psychologist, on September 14th. Plaintiff met with McDermott again on September 29th in the office of Major Richard Belt, Park Police Operations Commander. Dr. McDermott told Major Belt that plaintiff had agreed to undergo hypnosis in an attempt to treat his fear of horses. Plaintiff testified that he never agreed to that.

Only two of the six members of plaintiff's mounted class completed the training. Of the other four, all but Hughley were white, and all but Hughley were permitted to transfer out. Officer Sheri Sholl became pregnant and, upon doctor's orders that she not ride a horse, did not undergo training. She later completed mounted training after giving birth. Officer John Hudock aggravated a prior injury during mounted training. He received fifteen shots of cortisone and took strong pain killers. Because of this treatment he could not ride,

so he returned to the patrol division. Officer Richard Gaither pulled a muscle in his right leg. He took a break from riding, and then attempted to continue training. Upon reinjuring his leg, he was permitted to leave mounted training.

Effective October 1, 1983, plaintiff was assigned to watch mounted training and to read horse books. His request to return to patrol duty was denied. On October 13th, Major Belt and Captain Klotz sent a letter to Hugh Robey, Director of Parks and Recreation, recommending that plaintiff's employment with the Park Police be terminated. The letter summarized plaintiff's record at the Park Police, as well as Dr. McDermott's opinion that plaintiff had a serious resentment of authority, was malingering, and would be a disciplinary problem regardless of his assignment. The letter stated that plaintiff had informed Lt. Col. Leslie that he refused to seek treatment for his fear of horses because plaintiff did not believe it was necessary to perform the duties of a Park Police officer. *See* Plaintiff's Exhibit 14B.

Hugh Robey sent a letter to plaintiff on October 18, 1983 informing him of Robey's intention to dismiss Hughley, and inviting plaintiff to explain his position before Robey took final action in the matter. The letter relayed the cause of dismissal as "unsatisfactory work performance while in probationary status." Plaintiff's Exhibit 11. Plaintiff asked Lt. Col. Leslie, Major Belt and Captain Klotz to explain the specific reasons for his termination, and the three men indicated that only Robey could furnish such information. Plaintiff wrote to Robey on October 19th requesting specific reasons for his discharge. Plaintiff's Exhibit 12. Robey responded on October 31st, explaining that he did not currently possess plaintiff's personnel file, and that he would instruct Lt. Col. Leslie to provide plaintiff with written reasons for his proposed termination. Plaintiff's Exhibit 13. Consequently, Lt. Col. Leslie sent plaintiff a copy of the October 13th memo to Robey, and scheduled a meeting on November 9, 1983 between himself, Captain Klotz and plaintiff to clarify any questions Hughley might have. Plaintiff's Exhibits 14A and 14B.

Robey informed plaintiff by letter dated November 17th that he intended to dismiss plaintiff effective December 2, 1983. Plaintiff responded that the memorandum provided to him by Lt. Col. Leslie did not adequately explain the specific reasons for his termination, and he requested, once again, a written rationale. Plaintiff's Exhibit 16. Robey replied that Leslie and Belt had advised plaintiff of the specifics on November 9th, and that, basically, these reasons resulted in an unsatisfactory overall rating during plaintiff's probationary period. Plaintiff's Exhibit 17.

Plaintiff was discharged effective December 2, 1983. At the time, plaintiff earned $17,102. Several of plaintiff's witnesses testified that they knew of no employee other than Hughley who had been fired for failing to complete mounted training. Plaintiff filed a complaint with the Maryland Human Relations Commission on October 24, 1983 alleging discriminatory job termination, and he received a right-to-sue letter from the Equal Employment Opportunity Commission.

## II.  DISCUSSION

The well-known allocation of burdens in a Title VII suit was set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, plaintiff bears the burden of proving by a preponderance of the evidence a prima facie case of discrimination. If plaintiff succeeds, the burden shifts to defendant to articulate some legitimate, nondiscriminatory reason for the employee's discharge. Should defendant carry this burden, plaintiff then has the opportunity to show by a preponderance of the evidence that defendant's stated reasons were in fact a pretext for discrimination. *McDonnell Douglas, supra,* 411 U.S. at 802–804, 93 S.Ct. at 1824–1825. The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff remains

at all times with the plaintiff. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093.

### A.

■ The *McDonnell Douglas* Court stated that a prima facie case of discrimination may be established by showing:

(i) that [plaintiff] belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. Although *McDonnell Douglas* involved a claim of discriminatory failure to hire, the above criteria may be adapted to discriminatory discharge suits. Factor (ii) would be altered to require that plaintiff was qualified for the job he was performing, and factor (iii) would read, despite plaintiff's qualifications, he was terminated. *Tankha v. Costle,* 536 F.Supp. 480, 481 (N.D.Ill.1982). Factor (iv) may be satisfied by proof that plaintiff was replaced by a non-minority worker. *State Div. of Human Rights v. Ozone Industries,* 610 F.Supp. 438, 440 (S.D.N.Y.1985). One additional element is required in discriminatory discharge cases: plaintiff must show that he was satisfying the normal requirements in his work. *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir.1977). He need not demonstrate perfect performance to satisfy this element. Plaintiff "need only show that his performance was of sufficient quality to merit continued employment." *Id.* at 283.

The proof required to establish a prima facie case of discrimination will necessarily vary in different factual situations. The five factors outlined above will not meet the needs of every case. For example, it might be difficult in this case to prove factor (iv), the kind of applicant who may have replaced plaintiff:

Perhaps the relevant feature which distinguishes police work from other occupations is that police officers graduate as a class from an academy and are hired as a group, whereas other types of jobs are filled on an individual basis. This somewhat unique aspect of the police department's hiring process makes it difficult, if not impossible, to determine who was hired to replace a discharged officer.

*Ratliff v. City of Milwaukee,* 608 F.Supp. 1109, 1124 (E.D.Wis.1985), *aff'd,* 795 F.2d 612 (7th Cir.1986). A more useful factor in this case would be to determine whether plaintiff was similarly situated to others who received preferential treatment. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 282, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976) ("the complaint asserted that petitioners were discharged for their alleged participation in a misappropriation of cargo ..., but that a fellow employee, likewise implicated, was not so disciplined, and that the reason for the discrepancy in discipline was" race); *Scott v. Univ. of Delaware,* 601 F.2d 76, 81 (3d Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979) (plaintiff did not prove that he was similarly situated to others who received preferential treatment); *Menefee v. General Electric Co.,* 548 F.Supp. 619, 622 (N.D.Ill.1982). Thus, a prima facie case would be proved here by showing:

(i) that plaintiff belongs to a racial minority;

(ii) that he was qualified for the job he was performing;

(iii) that he was satisfying the normal requirements in his work;

(iv) that plaintiff was terminated; and

(v) that he was similarly situated to others who received preferential treatment.

Plaintiff Hughley established a prima facie case of discrimination. He is black, and therefore a minority. He was qualified for the job of Park Police Officer Candidate, as evidenced by his exemplary performance at the police academy. He was satisfying what he contends were the normal requirements in his work because he successfully completed training at the academy and in the patrol section, and he was willing to

undergo training other than that in the mounted unit in order to complete his probationary year. Plaintiff was fired for failing to complete mounted training, whereas white officers who did not complete the training for medical reasons received preferential treatment in the form of reassignment. Accordingly, plaintiff raised an inference that racial discrimination motivated his discharge.

### B.

Once a prima facie case of disparate treatment has been proved, defendant must articulate some legitimate, nondiscriminatory reason for the employee's discharge:

> The defendant need not persuade the court that it was actually motivated by the proferred reasons. [Citation omitted.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth ... the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.

*Burdine, supra,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95.

■ Defendant Commission has met its burden of production. Several of defendant's witnesses testified that once the job specifications were adopted in 1979, and the oral review board began informing each Park Police applicant that he or she may be required to ride a horse or motorcycle, drive a patrol car, or do foot patrol, mounted training became a condition of employment for those officers hired after 1979 who were assigned to such training. No such officer would be excused from the training except for medical reasons. Clearly, mounted training was not a condition of employment for those officers and officer candidates who were never assigned to it. But even plaintiff's witnesses, specifically Officer Keeney and Sergeant Brownlee, testified that if a police officer candidate was assigned to mounted training, he would be required to complete it.

Officer Keeney testified that generally the mounted unit was a voluntary program. However, management could require probationary employees to take mounted training. Sergeant Brownlee testified he advised Hughley that if plaintiff were assigned to mounted training, he should put his best foot forward because he would be required to complete it. Officer Daniel Bryant, a member of plaintiff's class at the academy, stated that those tenured officers who had volunteered for mounted training could return to patrol, but the probationary employees did not have that option. Thus, plaintiff refused to follow through on an assignment he was required to complete.

When Park Police management learned from Dr. Ann Williams that plaintiff's fear of horses caused his symptomatology, and that his anxiety might be treatable, they sent plaintiff to a psychologist to determine whether treatment would enable him to continue training. Plaintiff refused to undergo the recommended treatment because he did not want to ride horses, and he did not believe that mounted training was a required condition of employment. Yet plaintiff testified he had been told mounted training was a condition of his employment.

Major Belt recommended plaintiff's termination because plaintiff refused to undertake treatment in order to carry out his assigned training. Hughley's lack of desire to ride a horse was insufficient reason to be excused from his assignment. Plaintiff had been informed that he must complete mounted training or undergo the treatment recommended by Dr. McDermott, otherwise he faced possible termination. Dr. McDermott suggested plaintiff begin one of two treatment regimens to conquer his fear of horses. Plaintiff rejected this assistance, and he refused to attempt to overcome his problem. In addition, Dr. McDermott had opined that plaintiff was malingering, that he resented authority, and that he would likely cause a disciplinary problem in the future.

This rationale satisfies defendant's burden of producing a legitimate, nondiscriminatory reason for terminating plaintiff Hughley.

## C.

The burden therefore shifts back to plaintiff to prove that this was not the true reason for defendant's employment decision, but rather a pretext for discrimination. Plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff need not prove that race was the sole reason for his discharge, but only that he would not have been discharged "but for" his race. *McDonald v. Santa Fe Trail, supra*, 427 U.S. at 282 n. 10, 96 S.Ct. at 2580 n. 10.

■ Plaintiff elicited testimony regarding the small number of black Park Police officers. Evidence that there were only four black officers among a force of sixty at the time plaintiff was employed is relevant to the question of a racially discriminatory motive. *See Osborne v. Cleland*, 620 F.2d 195 (8th Cir.1980). Without additional evidence, however, the connection between this showing and Hughley's discharge is too attenuated to compel a finding of such motive. *Id.* at 199.

Plaintiff argues that defendant's rationale for his discharge is mere pretext because mounted training was not a condition of employment with the Commission Park Police. Therefore, he contends, failure to complete the training is insufficient reason for termination. Plaintiff asserted that mounted training had been presented as an option at plaintiff's oral review board, and plaintiff had never been told that he would be required to undertake such training. Also, plaintiff testified that he had never been informed that if he did not seek treatment and attempt to complete mounted training, he would be terminated.

■ The Court accords little weight to plaintiff's contentions. Two credible witnesses testified that Lt. Col. Robertson had advised plaintiff at his oral review that he may be required to ride a horse, among other duties. In addition, Sergeant Brownlee, plaintiff's witness, informed Hughley that he would have to complete mounted training if assigned to it, and Captain Klotz told plaintiff that because he had been assigned to mounted training, he must complete it as a condition of his employment. Moreover, the October 13, 1983 memorandum provided to plaintiff in early November clearly indicated that plaintiff was being recommended for termination due to his refusal to attempt treatment or complete mounted training.

Several witnesses testified that they had never been told that mounted training was a condition of employment, and that they were aware of no employee other than plaintiff Hughley who had been terminated for not completing mounted training. While this evidence initially gave the Court some concern, upon further evaluation it does not prove that defendant's rationale was unworthy of credence, or that a discriminatory motive more likely than not motivated the decision to terminate Hughley. *Burdine, supra*, 450 U.S. at 256, 101 S.Ct. at 1095. All but one of these witnesses was hired prior to the 1979 specifications, thus they would not have been advised that mounted training was a condition of their employment. Officer Bryant, a member of plaintiff's academy class, testified that he expressed a desire to be in mounted training before his assignment to that unit. There was no need to inform Bryant that he had to undertake training as a condition of employment because he clearly would do so willingly.

■ As to the fact that no other employee suffered termination for failing to complete mounted training, each employment action must be evaluated according to its particular facts. In the first place, no employee hired prior to 1979 could be terminated for failing to take the training. Second, mounted training was conducted on an as needed bases. In certain years, the Commission did not run a class. Finally,

those assigned to the training were required to put forth a good faith effort. If they could not undertake the training due to a medical disability, each rationale was evaluated on a case-by-case basis. Plaintiff has presented no evidence that any probationary employee hired after 1979 refused to attempt to overcome his disability, as did plaintiff, and then was transferred out of mounted training.

Plaintiff does not dispute defendant's authority to assign him to mounted training. Nor does he contend his assignment was racially motivated. Rather, plaintiff argues that defendant's decision to terminate him for failing to complete the training was caused by racial animus. Plaintiff has failed to prove by a preponderance of the evidence that defendant's rationale was merely a pretext.

Both Captain Klotz and Major Belt testified that race played no part in their recommendation to fire Hughley. LeRoy Hedgepeth, who is black and director of the Commission's affirmative action program, reviewed the recommendation before a decision was made. As the affirmative action officer, he believed plaintiff's dismissal was not based upon race.

In addition, defendant's evidence showed that plaintiff was not truly similarly situated to the white officers in his class who were permitted to leave mounted training. First, the latter were tenured officers who volunteered for mounted training; none of them were probationers who had been assigned to participate. Second, each of the individuals made a sincere attempt to overcome their medical difficulties and continue training. Officer Sholl, excused because of pregnancy, eventually returned to complete the training. Plaintiff Hughley, on the other hand, stubbornly refused to even begin a treatment regimen that could resolve his fear of horses.

Sergeant Brownlee's experience with mounted training indicates that the Commission's decision to terminate Hughley was not motivated by racial animus. Sergeant Brownlee, a black officer, was hired before the 1979 job specifications. At one point Brownlee had been ordered to the mounted division. He submitted a letter requesting that he be excused from such training, and his request was honored. However, this occurred prior to the 1979 job specifications and adoption of the rule that probationers assigned to mounted training must complete it. After 1979, when plaintiff requested exemption, he was refused—not because of his race, but because of the rule that a probationary officer assigned to mounted training must make every effort to complete it, and would be excused only for a bona fide medical reason.

Although the written job descriptions provided to plaintiff did not articulate that once a probationary officer was assigned to mounted training, its completion became a condition of employment, numerous individuals notified plaintiff of this fact throughout his term with the Park Police. Plaintiff stubbornly refused to accept it. He wanted to complete his probationary period according to his own desires, namely to stay in the patrol section and out of mounted training. But police work requires that an individual accept and act upon commands from superiors. Defendant interpreted plaintiff's actions as indicative of a disciplinary problem, and defendant fired plaintiff for this reason.

While this Court might have handled the employment decision differently, the judiciary's role is not to assess the prudence of each job action and set it aside if the court deems it ill-considered or unwise. Rather, our role is limited to assuring that such decisions are not based on impermissible factors such as race. The "law does not require, in the first instance, that employment be rational, wise, or well-considered—only that it be nondiscriminatory." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1157 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). Plaintiff Hughley has failed to prove that his termination was the result, in whole or in part, of racial animus. Accordingly, this Court finds for defendant, and plaintiff's complaint will be dismissed.