**Paul EVANS, Plaintiff,**

v.

**THE NEW YORK BOTANTICAL GARDEN, Gregory Long and John Rorer, Defendants.**

**No. 02 Civ. 3591(RWS).**

United States District Court, S.D. New York.

March 25, 2003.

Vincent I. Eke–Nweke, P.C., Brooklyn, NY, By: Vincent I. Eke–Nweke, for Plaintiff, of counsel.

Clifton Budd & DeMaria, New York, NY, By: Michael J. Volpe, George F. Brenlla, for Defendants, of counsel.

### OPINION

SWEET, District Judge.

Defendant the New York Botanical Garden (the "Garden") has moved pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 to dismiss the complaint of plaintiff Paul Evans ("Evans"), who alleges that he was fired as a result of racial discrimination and his filing of a complaint with the New York State Division of Human Rights. Evans has also moved pursuant to Fed.R.Civ.P. 15(a) to amend his complaint to include a claim that the Garden's actions were in contravention of 42 U.S.C. § 1981.

For the following reasons, Evans's motion to amend his complaint is denied, and the Garden's motion for summary judgment is granted.

### Prior Proceedings

Evans commenced suit on May 8, 2002 against the Garden and two of its employees, Gregory Long and John Rorer, alleging (1) racial discrimination in contravention of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York Executive Law § 290, et seq., (the "Executive Law"), and the New York City Administrative Code ("City Law"); and (2) unlawful retaliation in violation of Title VII, Section 1981, the Executive Law, and the City Law.

By order dated September 4, 2002, Evans' Section 1981 claims were dismissed because they were found to be precluded by an earlier determination of "no probable cause" by the New York State Division of Human Rights, and it further was noted that Evans had withdrawn his claims under the Executive Law and the City Law. Evans v. New York Botanical Garden, 2002 WL 31002814, at *6 (S.D.N.Y. Sept.4, 2002). Leave was granted to seek to amend the complaint to add the dismissed § 1981 claims if new evidence was discovered that suggested that Evans did not have a full and fair opportunity to litigate his claims in the state administrative proceeding.

On December 11, 2002, Evans filed the instant motion to amend his complaint to add the § 1981 claims. The Garden responded on January 9, 2003.

On December 18, 2002, the Garden filed the instant motion for summary judgment. Evans responded on February 5, 2003, and the Garden replied on February 11, 2003.

Both motions were considered fully submitted on February 12, 2003.

### Facts

As befits a motion for summary judgment, the following facts are derived from the parties' Local Rule 56.1 statements.

Since 1989, the Garden has sponsored a community outreach program throughout the borough of the Bronx, called the Bronx Green–Up Program (the "Program" or "BGU"). BGU primarily assists neighborhood groups in the Bronx to develop and maintain community gardens by providing technical assistance in garden development and the care of established gardens. Some portion of the gardens that participate in BGU are marked with signs for public relations purposes demonstrating

the Garden's involvement with community gardens.[1]

The BGU during the relevant times also administered a composting project, funded by the New York City Department of Sanitation (the "Compost Project"). As part of the Compost Project, the Garden and the Sanitation Department entered into a contract in an effort to recycle certain products and reduce the amounts of organic waste.

In August 1996, Evans was hired as the director of the BGU. In that position, Evans' main responsibilities were to oversee the outreach to community gardens. One facet of this task was to supervise staff whose responsibility it was to keep an inventory list[2] of the participating gardens and put signs in community gardens to demonstrate the Garden's involvement. As part of his job, Evans also was required to supervise seasonal interns and six employees, assist in fund-raising, and oversee the Compost Project.

When Evans was first hired in 1996 until March or April of 1998, Richard Schnall ("Schnall") was his direct supervisor. From that time until July 1998, Joseph Kerwin ("Kerwin") was his direct supervisor. Evans does not allege that he was subjected to any discrimination during the time that Schnall and Kerwin were his supervisors.

In July 1998, BGU was transferred from the Horticulture Department to the Children's Education Department. Consequently, Elaine Drazin, associate vice-president for Children's Education ("Drazin"), became Evans's supervisor. Drazin did not work closely with Evans despite her nominal title as his supervisor.

In the winter of 1998, the Garden's president, Gregory Long ("Long") had a meeting with Assemblywoman Gloria Davis, who held the 79th Assembly District seat in the Bronx from 1980 to January 2003 ("Davis"). In that meeting, Davis told Long that she had never seen any BGU signs in any of the gardens in her district. As a result, Long later instructed Evans to make sure that each garden in Davis's district had a sign. Prior to that time, Long had also inquired about Evans' program for posting and/or replacing signs in the spring of 1997. In addition, Evans' performance evaluation dated March 10, 1998, set as one of Evans' performance goals for 1998 the "better documentation of gardens—signage."

In March 1999, Evans was scheduled to receive a performance review for the period of January 1, 1998 to December 31, 1998. Drazin, with input from her supervisor, John Rorer, the chief operating officer and executive vice president of the Garden ("Rorer"), analyzed Evans' work performance and set forth specific goals that Evans was supposed to accomplish.[3] Drazin recognized that she "really couldn't make a fair assessment" of Evans' performance due to her lack of contact with Evans.

On March 29, 1999, Evans received his performance evaluation. At that time, Evans admitted that his efforts to update the community garden inventory had not been completed and that he had failed to put up the 325 signs necessary to ensure that all

---

**1.** When Evans first was hired, not all the gardens had signs, and some signs were in poor condition. As a result, Evans initially planned to create twenty-five to fifty new signs per year.

**2.** The inventory list included the names, addresses, phone numbers and other pertinent information of the contact persons that participated in BGU.

**3.** Contrary to Evans' assertions, Drazin testified that she spoke with Rorer about all of her subordinates she evaluated.

the gardens in Assemblywoman Davis's district had a BGU sign.

On June 17, 1999, one of Evans' subordinates who is white, Michael O'Connor, the BGU program manager ("O'Connor"), tendered his notice of resignation. Evans had hired O'Connor to that post a little less than two years earlier, in October 1997. Drazin accepted O'Connor's resignation and directed Evans to hire another program manager to replace O'Connor.

When Rorer became aware that O'Connor had tendered his resignation, Rorer directed Drazin to find out how to keep O'Connor from resigning. O'Connor told Drazin that he did not want to work directly for Evans, after which time a position was created for O'Connor in which he would no longer have to report directly to Evans.[4] That position was that of Community Garden liaison, which O'Connor accepted effective August 16, 1999. In that position, he reported directly to Drazin and his salary was increased from $32,115 to $42,000 per annum.

By letter dated July 1, 1999, Drazin, in conjunction with Rorer, provided Evans with a written warning requiring that performance deficiencies improve.

On July 6, 1999, Evans met with Rorer, Drazin and Earl Brown, the then director of governmental relations. Brown is black. The meeting was ostensibly about BGU, but instead focused on Evans' work performance, areas that needed improvement and his vision for the future of BGU.

By memorandum dated July 12, 1999, Evans responded to the July 1 letter. At that time, he acknowledged that (1) the update of the community garden inventory was not completed; (2) not all the gardens in Assemblywoman Davis's district had a sign; and (3) he was not on the "front-line" with gardeners due to time constraints and the amount of requisite paperwork. At that time, Evans also expressed concern about the amount of turnover in BGU. During Evans' employment, six employees under his supervision had resigned from their employment.

Drazin, in conjunction with Rorer, responded to the July 12, 1999 memorandum in a document dated July 28, 1999. In that memorandum, Evans was informed that his work performance needed to improve or he would be terminated.

On August 20, 1999, Evans filed a complaint of race and age discrimination with the New York Division of Human Rights.

In October 1999, Drazin was terminated. As a result, Rorer became Evans' immediate supervisor. Rorer met with Evans on several occasions after he became Evans' supervisor. At one meeting regarding the Compost Project, Rorer inquired as to why the Department of Sanitation's contract with the Garden had not yet been renewed. Evans responded that he believed the Department of Sanitation was merely taking a long time to renew it as the renewal was always late. At a subsequent meeting, Rorer sought an update regarding BGU and requested a written report regarding future funding sources for BGU. Evans claims to have delivered that list to Rorer's in-tray after he was fired.

According to Rorer, Evans' performance did not improve. As of November 17, 1999, the updated community gardens inventory had not been completed. Evans claims that his performance was as a result of having too few subordinates.

As per Rorer's practice, Rorer informed Long that Rorer was going to terminate Evans' employment. On November 17, 1999, Rorer and Sally Gavin, the then associate vice-president for administration

---

4. Evans claims that O'Connor did not want to work directly for Evans because Evans is black; there is no other evidentiary support for this assertion.

who was responsible for Human Resources ("Gavin"), met with Evans and informed him that his employment with the Garden would be terminated because of his work performance.

Effective November 17, 1999, O'Connor was promoted to acting director of the BGU. The personnel form denoting this promotion was approved by Earl Brown, who was promoted to associate vice president for government and community relations[5] sometime after Evans was fired. His signature is dated January 25, 2000, although the action was effective November 17, 1999. Evans claims that the decision was entirely made by Rorer and that O'Connor was not directly supervised by Brown because Rorer was the supervisor in fact of BGU. There is no other evidentiary support for this claim. O'Connor remained as BGU director until he voluntarily resigned from that post on August 17, 2001.

## Discussion

### I. *Evans' Motion to Amend*

Evans was granted leave to move to amend his complaint to include Section 1981 claims if he discovered new evidence suggesting that he had not had a "full and fair opportunity" to litigate those claims before the NYSDHR.

■ In determining whether a party against whom preclusion is sought was afforded a "full and fair opportunity to litigate," in the administrative proceeding, a court must consider the " 'realities of the prior litigation,' including the context and other circumstances which may have had the practical effect of discouraging or de-

terring a party from fully litigating the determination which is now asserted against him." *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984) (citations omitted). Relevant, for example, is the nature of the prior forum, the importance of the issue or claim in the prior proceeding, the party's incentive and initiative to litigate the issue or claim, the competence and expertise of counsel, the availability of new evidence, the difference in the applicable law, and the foreseeability of future litigation. *Id.*

Evans does not contest this Court's earlier observation that the NYSDHR conducted a "lengthy investigation" that "includ[ed] interviewing a number of witnesses,[6] subpoenaing documents and including records provided by Evans." *Evans*, 2002 WL 31002814, at *5. Instead, he makes two arguments as to why he did not receive a full and fair opportunity to litigate: (1) the NYSDHR interviewed an anonymous witness who was no longer employed by the Garden, and (2) the Garden purportedly misrepresented a material fact to the NYSDHR with regard to the reason for Drazin's termination.

### A. *Interview of Anonymous Witness*

■ On March 22, 2001, the NYSDHR investigator, Glenn Nichtenhauser ("Nichtenhauser"), interviewed an anonymous witness in connection with Evans' complaints and obtained a statement from that witness. Nichtenhauser did not notify Evans of the interview, nor was Evans provided with a copy of the interview summary from the witness until July 16, 2002,

---

5. BGU was also transferred to his department.

6. Evans does point out that the Opinion apparently incorrectly stated that the NYSDHR investigation included interviews of two employees—Ann Wiesen and Michael O'Connor—as there is no evidence of such inter-

views in the investigatory file. (At the same time, Evans contradictorily asserts that Wiesen was the "anonymous witness" about whom he complains.) Evans does not argue, nor could he, that such failure to interview these two witnesses would amount to a lack of full and fair opportunity to litigate.

when the NYSDHR provided Evans with a copy of the investigatory file. Nichtenhauser has not yet disclosed or confirmed the identity of the witness.

On August 27, 2002, Evans wrote to Nichtenhauser to confirm his suspicions that the anonymous source was Ann Wiesen, one of his former subordinates, and to assert that the statements "are either false or entirely unsubstantiated opinions." He also stated that he would have responded to the assertions if he had been made aware of them in a timely fashion.

Nichtenhauser replied in a letter dated September 5, 2002, stating that, "as noted in the file, the person I spoke to asked not to be identified. Furthermore, the information attained from this person was not critical or germane to the determination. In essence, the determination would have been the same with or without this statement."

Evans styles the discovery of the anonymous witness as "new evidence," the presence of which would have altered his strategy in pursuing his claims with the NYSDHR. However, in light of Nichtenhauser's statement about the non-dispositive nature of the evidence, Evans' inability to cross-examine the anonymous witness or to put in evidence against the information provided in the interview cannot establish a lack of a full and fair opportunity to litigate the issue before the NYSDHR. *E.g., Mendoza v. SSC & B Lintas New York,* 799 F.Supp. 1502, 1511 (S.D.N.Y.1992) (plaintiff had full and fair opportunity to litigate even though he did not have opportunity to cross-examine persons who had submitted affidavits with information suggesting the complaint was without merit).

Evans' motion to amend based on this "new evidence" therefore must be denied.

### B. *Representation About Drazin*

■ Evans also argues that the Garden misrepresented a material fact to the NYSDHR. At a March 10, 2000 conference, Rorer stated that "Elaine Drazin was terminated for exactly the same reason that Paul Evans' employment was terminated—poor performance."

On October 26, 2001, the NYSDHR issued a Determination and Order After Investigation in which it concluded that there was no probable cause to believe that the Garden had engaged in the unlawful discriminatory practice complained of. The Order based this finding, in part, on the following conclusion:

The investigation revealed that [Evans's] supervisor was terminated for poor job performance on October 6, 1999, and [Evans] was terminated for poor job performance on November 17, 1999.

The investigation revealed that [Evans's] supervisor who is Caucasian and 41 years of age was terminated for the same or similar reason as [Evans] was terminated, including the Respondent's dissatisfaction with turnover on their staffs.

Order, at 2. The order was also based on findings that Evans had faced criticism for his job performance and that O'Connor, although he was promoted, received a lower salary than Evans and did not supervise a staff. *Id.* at 1.

Citing to the deposition testimony of Gavin, Rorer and Drazin, Evans now claims that Drazin was not in fact terminated for poor job performance, but rather due to a restructuring of the Garden's Children's Education Department. The evidence Evans puts forward is not so clear cut as to show that the NYSDHR—which had the opportunity to interview the people involved instead of working from the record, and thus was able to make

credibility determinations—based its determinations upon a faulty misrepresentation.

First, Evans points to Drazin's deposition. She testified that she was not told that she was fired for poor performance. She did not say, however, that she was not fired for poor performance.

The other deposition testimony is even less supportive. Gavin, who was in charge of the Human Resources Department at the relevant times, testified that "there were probably issues with [Drazin's] performance that made [the] administration feel that she wasn't the right candidate to take [the department] to the next level." (Gavin Dep. at 39.) Yet when asked directly whether Drazin's work performance was the reason she was fired, Gavin admitted it was not. *Id.* at 39–40. The earlier statement showed, however, that, as Rorer later testified:

> Miss Drazin was terminated, as I said to you before, because she could not provide the kind of leadership we needed from her. Were there areas of her performance that were not satisfactory, yes.... [W]e could discuss whether [the fact that she was not able to provide the kind of leadership that needed to be provided] would be considered poor performance or lack of skills, but those were the reasons.

Rorer Dep. at 24–25.

Evans' argument therefore appears to be based on semantics and snippets of deposition testimony hinging on the distinction that Rorer points out above. The deposition testimony shows that Drazin was terminated because she was not able to fulfill her position in the way in which the administration intended and hoped for it to be filled. Such inability to perform up to snuff can certainly be construed as poor work performance. As a result, it cannot be said that the Garden misrepresented any material fact on which the NYSDHR relied in making its decision. Therefore, Evans' motion to amend is denied on this ground as well.

Because of the above findings, Evans may not amend the complaint to include Section 1981 claims, and all that remains are the Title VII claims, against which the Garden has moved in summary judgment.

## II. *Summary Judgment*

### A. *Standard of Review*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002).

"The salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Nicastro v. Runyon,* 60 F.Supp.2d 181, 183 (S.D.N.Y.1999) (*citing Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)). Great-

er caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue. *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999). *See also Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) ("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.") (internal quotation marks and citation omitted; brackets in the original). But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (*citing Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)).

### B. *Evans' Discrimination Claim*

Two methods exist by which a plaintiff can attempt to prove intentional discrimination. First, the plaintiff may present direct evidence of employment discrimination based on an illegitimate criterion. When an employee produces direct evidence that an illegitimate criterion such as race "played a motivating part in [the] employment decision," *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989), the burden-shifting standards of *Price Waterhouse* apply. As such, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Id.* at 258, 109 S.Ct. at 1795.

Evans claims to have satisfied this burden because the Garden "preferred to discharge Evans in favor of a White subordinate, with limited work experience, who made it known that he did not want to work under a Black supervisor." Pl.'s Mem. at 10. Evans has presented no di-

rect evidence that O'Connor ever stated that he did not want to work for a black supervisor or of any other direct discriminatory statement or action. Therefore, it is necessary to turn to the second means of proving discrimination.

When plaintiffs rely on indirect or circumstantial evidence of discrimination, their claims are analyzed under the three-part test announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish his *prima facie* case by showing (1) he was a member of a protected group; (2) he was satisfactorily performing the duties required of the position; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. *E.g., McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). Second, if the plaintiff successfully establishes a *prima facie* case of discrimination, the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988) (the defendant "is required to articulate—but not prove—a legitimate, non-discriminatory reason for the discharge"). Finally, if the defendant articulates a non-discriminatory reason, the plaintiff must come forward with evidence that the defendant's articulated non-discriminatory reason is a mere pretext for actual discrimination. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) ("The plaintiff must 'produce not simply some evidence but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false and that more likely than not [discrimination] was the real reason for the' " employment action (quotations and citations omit-

ted; brackets in original)). Whether a judgment as a matter of law is appropriate depends upon a number of factors, including the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case that may be considered on a summary judgment motion. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### 1. *Prima Facie Case*

■ "The burden of establishing a prima facie case is a modest one, but it has substance nevertheless." *Viola v. Philips Med. Sys.*, 42 F.3d 712, 716 (2d Cir.1994). The Garden does not contest that Evans is a member of a protected class and that he was discharged. The Garden does argue, however, that Evans has failed to establish his *prima facie* case in that he has failed to establish that his work was satisfactory or that his termination occurred under circumstances that give rise to an inference of race discrimination.

With regard to Evans' performance of his duties,[7] the undisputed evidence shows that Evans received poor performance evaluations in 1999. In response, Evans points to the fact that throughout the duration of his employment as director of BGU, Evans performed various duties involving horticulture, education, administration, community relations and gardening, public fundraising, program evaluation, on-site visits, supervision of staff and budgeting. He also notes that he has received numerous letters of appreciation on account of his performance from various per-

sons or entities serviced by BGU. Further, the two evaluations Evans received in the approximate year and one-half prior to those administered by Drazin were satisfactory or better than satisfactory. Finally, Evans suggests that Drazin's evaluations were unfounded.

With regard to raising an inference of discrimination, Evans points to the alleged unfounded evaluations and alleges that the Garden fired him because O'Connor did not want to work for a black supervisor and in order to promote a white man, O'Connor, to his position.

It is unnecessary to reach the question of whether this showing is sufficient to establish a *prima facie* case, because it is held that even assuming this circumstantial evidence meets the threshold of sufficiency, Evans has failed to proffer any evidence from which a reasonable jury could find that the Garden's asserted reason for the discharge was a pretext for discrimination.

### 2. *Pretext*

■ The Garden states that it fired Evans because of poor work performance. This reason is legitimate and non-discriminatory. As a result, it is Evans' burden to demonstrate that it was a mere pretext for discrimination. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993).

---

**7.** According to a 2002 job description on the Garden's website, the position of BGU Director requires:

Community outreach and programming experience; 3+ years supervisory experience; strong interest in gardening, composting, and other environmental issues; BA in

Biology, Horticulture, Environmental Science or related fields; superior problem-solving and administrative skills; excellent communication and presentation skills; and valid driver's license required. Bilingual (Spanish/English) preferred.

As noted above, Evans' claim rests almost entirely on his belief that his performance evaluations in 1999 were unfounded. Such a claim is insufficient to meet his burden without some other indicia of discrimination at play. *E.g.*, *Viola*, 42 F.3d 712 (2d Cir.1994) (rejecting argument based on adverse performance reviews after 11 years of satisfactory reviews because "[d]ismissals are often preceded by adverse performance reviews."); *Ricks v. Conde Nast Publications*, 92 F.Supp.2d 338, (S.D.N.Y.2000) ("The mere fact that an employee disagrees with the employer's assessments of her work, however, cannot standing on its own show that her employer's asserted reason for termination was pretextual."); *Payne v. State of New York Power Auth.*, 997 F.Supp. 492, 498–99 (S.D.N.Y.1998) ("Plaintiff disputes [defendant's] evaluation of her performance ... and the subsequent decision to demote her. Missing from this dispute, however, is evidence—either direct or circumstantial—which points to the conclusion that Power Authority's explanations for demoting plaintiff are a pretext for race discrimination."); *Orisek v. American Inst. of Aeronautics and Astronautics*, 938 F.Supp. 185, 191 (S.D.N.Y.1996) (plaintiff's "own disagreement with her employer's perception of her job performance does not satisfy her burden of showing that the [employer's] proffered justification was a pretext for discrimination"); *Ashton v. Pall Corp.*, 32 F.Supp.2d 82, 91 (E.D.N.Y. 1999) ("Plaintiff relies upon optimistic expectations that at trial he will prove that defendant created plaintiff's negative performance evaluation to justify his termination, which, he claims, is only a pretext for the real reason he was discharged—his age. Such blanket statements have no probative value."). As a result, Evans' case fails in the absence of some direct or indirect evidence suggesting that the poor evaluation and eventual discharge resulted from racial discrimination.

As the Garden points out, Evans can point to no discriminatory statements made to him. In addition, at the time he was fired, a black employee, Brown, was promoted to a high administrative position in which he was responsible for BGU.[8] The only evidence at all—other than Evans' conclusory and unsupported assertions—is the fact that O'Connor, who is white, was promoted as acting director of BGU after Evans was fired despite having less experience than Evans. This alone is insufficient to establish a genuine dispute of fact as to whether the Garden's reason was pretextual. *E.g.*, *Orisek*, 938 F.Supp. at 192 ("The mere fact that a younger, American man was selected is not a reasonable basis on which to conclude that [plaintiff] was passed over because of her age, gender or national origin. Such speculation, without more, is insufficient to support her claim that [the defendant's actions were] pretextual.").

Evans also alleges that O'Connor refused to work for a black man, but he provides no evidentiary support for this belief, and that belief is in any case contra-

---

**8.** Evans points out that Brown was the only black administrator among approximately twenty-five administrators. He relies on a case from outside this Circuit, *Hughley v. Maryland–National Capital Park & Planning Comm'n*, 668 F.Supp. 469, 476 (D.Md.1987), which states that "evidence that there were only four black officers among a force of sixty at the time plaintiff was employed is relevant to the question of a racially discriminatory motive." Evans neglects to point out the *Hughley* court's determination, however, that without additional evidence, the connection between the showing of few black officers and the plaintiff's discharge was too attenuated. Similarly, in the absence of other evidence linking the relative paucity of black administrators at the Garden to Evans' discharge, this factor does not sufficiently present an issue of fact as to whether the Garden's non-discriminatory rationale was pretextual.

dicted by the undisputed facts. First, while it is undisputed that O'Connor did not want to work for Evans, there is no evidence from which to conclude that the reason he did not want to work for Evans was because of Evans' race. Indeed, O'Connor reported to and worked for another black supervisor, Brown, from November 1999 until O'Connor voluntarily resigned in August 2001. Further, there is no evidence that the Garden fired Evans as a result of O'Connor's feelings, whatever they were. O'Connor left Evans' direct supervision for a higher-paying post effective August 16, 1999—months before Evans was fired. As a result, by the time Evans was fired in November 1999, O'Connor was no longer under his supervision and so no longer could complain about working for Evans.

In light of the absence of any evidence to support a finding of discrimination and the undisputed evidence that contradicts Evans' conclusory claims thereof, no reasonable factfinder could infer that the Garden discriminated against Evans on the basis of race. While it is unfortunate that Evans' job performance was considered unsatisfactory after a period of satisfactory employment, there is no evidence, even resolving all ambiguities and drawing all reasonable inferences in Evans' favor as is required for a summary judgment motion, that this change was based upon unlawful discriminatory conduct.

### C. *Evans' Retaliation Claim*

A Title VII retaliation claim is also analyzed under the rubric of *McDonnell Douglas. Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995). First, in order to make out a *prima facie* case of retalia-

tion, a plaintiff must establish (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768–69 (2d Cir.1998). Second, if the plaintiff establishes a *prima facie* case of retaliation, the defendant may articulate a legitimate, non-retaliatory reason for its actions. *Id.* at 768. Finally, if the defendant does so, the plaintiff must prove that the proffered reason is merely a pretext for retaliation. *Id.* at 769.

In light of the finding above that Evans failed to raise a material issue of fact with regard to whether the Garden's proffered non-discriminatory reason for firing him was pretextual, the Garden's motion for summary judgment to dismiss Evans' retaliation charge is granted as no reasonable factfinder could conclude that Evans was discharged due to discriminatory reasons.[9]

### *Conclusion*

In light of the foregoing, Evans' motion to amend his complaint to add Section 1981 claims is denied, and the Garden's motion for summary judgment is granted as to both remaining counts of Evans' complaint.

It is so ordered.

9. In any case, the fact that Evans had been warned that he was facing termination prior to filing the complaint with the NYSDHR casts grave doubt on Evans' ability to make a *prima facie* case of retaliation. *E.g., Ricks v.* *Conde Nast Pubs.*, 92 F.Supp.2d 338 (S.D.N.Y. 2000) (granting summary judgment where plaintiff received two warnings prior to filing her complaint).