Robert ROGE, Plaintiff–Appellant,

v.

NYP HOLDINGS, INC., Defendant–Appellee.

Docket No. 00–7773.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 2001.

Decided July 16, 2001.

Leslie H. Ben–Zvi, Queller, Fisher, Dienst, Serrins, Washor & Kool, LLP (Alan Serrins and Joseph A. Turco, of counsel), New York, NY, for Plaintiff–Appellant.

Clifford Thau, Squadron, Ellenoff, Plesent & Sheinfeld, LLP (J. Jordan Lippner and Laura Davidson, of counsel), New York, NY, for Defendant–Appellee.

Before VAN GRAAFEILAND, WINTER, and CALABRESI, Circuit Judges.

WINTER, Circuit Judge:

Robert Roge appeals from Judge Hellerstein's grant of summary judgment and dismissal of his complaint. Roge claims that his employer, NYP Holdings, Inc. (usually "Post"), owner of the New York Post, terminated him because of his age. On appeal, he argues that the district court failed to consider evidence of pretext and that other material issues of fact remain in dispute. However, it is undisputed that Roge's position was eliminated in the course of a cost-saving restructuring. Further, the circumstances surrounding his claims for disability benefits provided a legitimate, nondiscriminatory reason to select him for termination. We therefore affirm.

## BACKGROUND

This being an appeal from a grant of summary judgment, we view the deposition testimony, affidavits, and documentary evidence in the light most favorable to appellant. *See Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir.1996).

Roge began working at the Post in 1952, as a newspaper carrier boy. He held various positions at the paper over the next forty-five years until his termination at the age of fifty-six. The Post was in bankruptcy when it was acquired by appellee NYP Holdings in 1993. After the acquisition, appellee implemented a cost-saving restructuring that resulted in a reduction in force. Roge was at that time the paper's Suburban and Country Circulation Manager. As part of the restructuring, Roge was transferred in 1994 to the position of Night Circulation Manager, which entailed reduced responsibility. The Post's Vice President of Circulation and Labor Relations, John Amann, testified that the transfer was effected because Amann believed that Roge lacked initiative. As a result of the transfer, Amann also reduced Roge's car allowance from $600 a month to $200 a month, because Roge's new position did not require him to use a car for business purposes. Amann stated that he did not eliminate the allowance altogether because Roge had been a long-term employee and was accustomed to receiving it. The employee who assumed Roge's former position of Suburban and Country Circulation Manager was fifty years old-four years younger than Roge at the time.

Roge also claims that four or five negative remarks related to his age were made by three Post employees, including Amann, in 1994 and 1995, more than eighteen months before his termination. Although the employees deny making such remarks, we must assume that they were made.

In 1996, the Post launched its first Sunday edition. As a consequence, shifts had to be rescheduled to have Circulation Managers on hand to staff that edition. Because of hip replacement surgery, Roge was not working when the Sunday edition was first launched. When he returned to

work on May 21, 1996, he was told that he now would have to work Saturday nights. Roge reacted badly to this information and asked his superiors whether they were "forcing [him] to quit." He was understood by some at the Post to say that he would rather resign than work Saturday nights.

The next day, Roge was admitted to the hospital for chest pains. After his release from the hospital in early June but before his return to work, Roge and his wife met with his cardiologist, Dr. Murray Weinstock. According to Dr. Weinstock, Mrs. Roge indicated that Roge's work environment had become exceedingly stressful. At that point, either Mr. or Mrs. Roge–Dr. Weinstock could not recall which–"basically asked [him] ... to write a letter that he could not go back to work." As a result, Dr. Weinstock wrote a letter to the Post that stated: "Robert Roge is under my care for coronary artery disease and pulmonary emboli and is no longer able to work." Roge also sent the Post a letter from another doctor, John T. Andronaco, that stated that Roge had degenerative arthritis.

Upon receiving the doctors' letters, the Post sent Roge disability forms. Dr. Weinstock helped Roge fill them out and certified that Roge had "ASHD Angina." Next to the line entitled "Date Patient is able to return to work," Dr. Weinstock wrote, "Not able to return to work." On a second disability form, Dr. Weinstock again wrote "Not able to return to work" and indicated that Roge's disability was total.[1] Roge signed the forms.

After Roge sent the forms to the Post, Eileen Cross, who was in the Human Resources department of a Post sister company, called Roge and explained to him the long-term disability benefits for which he was eligible. According to Cross, Roge was not satisfied with the package and stated that he would return to work. Cross stated that she told Roge that a physician's note would be required before he could return. Roge disputes Cross's account of this conversation.

Also in response to Roge's disability forms, Amann wrote Roge a letter stating that he was sorry that Roge would not be returning to work because of his disability and accepting his resignation. Roge responded that there had been a misunderstanding, that he had no intention of resigning, and that he would be returning to work.

According to Dr. Weinstock, Roge told him that he, Roge, had previously overestimated the available disability benefits and wanted Dr. Weinstock to certify him as able to work. Dr. Weinstock refused. Shortly thereafter, Cross and Dr. Weinstock had a conversation, during which, according to Cross, the doctor told her, "between you and me, Bob Roge is not disabled." At his deposition, Dr. Weinstock did not recall making that statement but did recall telling Cross that Roge could not return to work. Roge thereafter obtained letters from two other cardiologists stating that he could return to work as of July 8, 1996. On July 5, 1996, Dr. Weinstock wrote separate letters to Mr. and Mrs. Roge stating to each that he could no longer be responsible for their medical care. He did this as a result of their having asked him to write a letter claiming disability and then to reverse that position.

---

1. Roge had submitted disability forms before, at the time of his hip replacement surgery in February 1996. On those earlier forms, Dr. Andronaco filled in the date on which it was estimated that Roge would return to work. The later forms, filled out by Dr. Weinstock, had no such dates.

Roge's disability claim, quickly followed by a reversal of position, lead Amann to suspect that Roge "had attempted to fraudulently obtain disability benefits, and that plaintiff changed his mind when he discovered" the details of his benefits package.

While Roge was still out on disability, the Post continued its restructuring, which resulted in various jobs being eliminated and consolidated. Roge has not shown a relevant pattern relating to age in those who lost their jobs. Twelve such employees were over forty years of age; eleven were under forty.

Roge's position was one of those eliminated. Some of Roge's duties, such as communicating with wholesalers, were automated. Others were distributed among numerous employees. One employee who was four years older than Roge assumed Roge's duties involving the supervision of employees. Four other employees, then-ages fifty-two, forty-two, forty, and one in his thirties, assumed the remainder of Roge's duties.

When Roge reported for work in late July 1996, he was informed by Amann that his position had been eliminated and that no work was available for him. According to Amann, he believed that Roge had committed disability fraud and that the fraud provided reason for a termination for cause, even if Roge's position had not been eliminated. However, Amann did not want to terminate a long-term employee without providing some benefits. He therefore offered Roge a severance package of one year's salary, based on the elimination of his position. Roge rejected the package, however, and filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"). In July 1998, Roge requested and obtained a "Right to Sue" letter from the EEOC, dismissing his charge. He then filed the present action.

At the conclusion of discovery, the Post moved for summary judgment, which the district court granted. *See Roge v. New York Post Holdings,* No. 98 Civ. 5248 (S.D.N.Y. May 9, 2000) (summary order). The court stated that although Roge had made out a prima facie case of age discrimination, the Post had established that there were non-discriminatory bases for his termination. The court ruled that the Post's suspicions about the veracity of Roge's disability claims as well as its elimination of Roge's job position as a result of the restructuring provided legitimate reasons for its employment decision. Further, the court found no evidence of pretext and no material issues of fact in dispute. This appeal followed.

## DISCUSSION

We review the district court's grant of summary judgement *de novo. See Bedoya,* 91 F.3d at 351. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."); *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d

Cir.2000) ("*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.") (internal quotation marks omitted).

Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

█ The framework for establishing a prima facie case of discrimination under Title VII of the Civil Rights Act of 1964, 42 U .S.C. §§ 2000e *et seq.*, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), also applies to ADEA claims. *See Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000) (applying *McDonnell Douglas* to ADEA claim). Under *McDonnell Douglas,* a plaintiff establishes a prima facie case of discrimination by showing that: (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone "substantially younger," *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (holding plaintiff need not be replaced by someone outside protected class to make case for age discrimination); *see McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Tarshis*, 211 F.3d at 35–36; *see also Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097 (applying framework to ADEA

claim); *James v. New York Racing Ass'n,* 233 F.3d 149, 153 (2d Cir.2000) (applying *McDonnell Douglas* to ADEA claim after *Reeves* ). Under the ADEA, individuals ages forty and over are members of the protected class. *See* 29 U.S.C. § 631(a).

█ The burden on the plaintiff of presenting a prima facie case under *McDonnell Douglas* is "minimal." *James,* 233 F.3d at 153 (internal quotation marks omitted). Once a prima facie case is established, a presumption arises that the employer unlawfully discriminated, and the burden shifts to the defendant to present a nondiscriminatory reason for the adverse employment action. *See id.* at 154. If the employer does so, the presumption of discrimination drops out, *see Tarshis,* 211 F.3d at 36, and the burden shifts back to the plaintiff, to prove "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (internal quotation marks omitted).

█ The district court found that Roge established a prima facie case under the ADEA. We need not reach that question because the Post met its burden to put forth legitimate, nondiscriminatory reasons for Roge's termination, and Roge has failed as a matter of law to proffer evidence of pretext sufficient to go to a trier of fact. The reasons offered by the Post were: (i) the elimination of Roge's position as a result of a cost-saving restructuring and (ii) the suspicious circumstances concerning Roge's disability claims.

There is no dispute over the fact that the Post, recently rescued from bankruptcy, was undergoing a cost-saving restructuring at the time of Roge's termination. It also is uncontested that, as part of that restructuring, the position of Night Circulation Manager, which Roge held prior to

his termination, was eliminated. Some of the Night Circulation Manager's tasks were automated, others were divided and distributed among five employees. Roge was not replaced.

"Even within the context of a legitimate reduction-in-force, however, an employer may not discharge an employee 'because' of his age." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir.), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). Nevertheless, the Post's second proffered reason for terminating Roge, rather than another employee, is also undisputed. The restructuring forced the Post to choose among employees as to who would be terminated. In such circumstances, it is common sense and entirely lawful for an employer to select for termination an employee who the employer in good faith believes recently engaged in fraud relating to the employment. Whether or not fraud actually occurred, questionable circumstances surrounding an employee's claim for benefits provide a nondiscriminatory reason for choosing to terminate that employee over others when economic reasons force the employer to make such a choice.

The record is clear that, at the time of Roge's termination, the Post believed, as a result of Roge's own actions, that Roge had committed disability fraud. First, Roge had submitted disability forms signed by Dr. Weinstock and himself that were regarded by the Post as claiming permanent disability. On appeal, Roge's brief takes issue with the Post's view of the forms as claiming permanent rather than temporary disability. This *post-hoc* argument cannot be squared with the record. The forms on their face indicated permanent disability. They indicated total disability because of a coronary ailment, and, unlike earlier disability forms filed by Roge, *see supra* note 1, they contained no

estimated date of return. Instead, where such a date would be included, Dr. Weinstock had written, "Not able to return to work." Moreover, it is undisputed that Dr. Weinstock intended the forms to indicate permanent disability, at least for work at the Post, and had discussed this with Roge before filling out the forms, which Roge signed. Roge can hardly contest the credibility of the Post's understanding the disability forms to mean what they were intended to mean. Second, while Roge disputes the Post's account of his conversation with Cross regarding disability benefits, he does not dispute that, following that conversation, he sought out two new doctors to certify him as able to work, a sequence of events known to Amann. Finally, he offered then, and offers now, no evidence that his medical condition had changed between the time Dr. Weinstock told the Post he was unable to work and the time the two new doctors told the Post the opposite. Based on these undisputed facts, the Post's suspicions concerning Roge's disability claims provided a legitimate non-discriminatory reason for terminating him.

Because the Post met its burden of production, Roge had the burden to "present evidence from which a fact-finder could reasonably conclude that the [employer's] reason was pretextual and that the real reason was discrimination." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 317 (2d Cir.1999). Roge contends that the district court failed to consider his evidence of pretext, namely, that the Post offered five inconsistent reasons for his termination: (i) Amann accepted his resignation on account of his disability; (ii) the Post stated that it accepted his resignation because he refused to work Saturday nights; (iii) Amann told him he was terminated because there was no work for him; (iv) the Post claimed that he was terminated as a result of the Post's reorganization; and (v) the

Post suspected that Roge had attempted to commit disability fraud.

■ We agree that a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff. *See Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 97–98 (2d Cir.1999); *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994). However, the Post's stated justifications in the present case are not inconsistent.

First, with regard to (i), Amann's letter accepting Roge's resignation on disability grounds, that letter did not purport to state a reason for his actual termination and is, therefore, not evidence of pretext. Roge had applied for total disability benefits, with the help of his doctor. Amann's letter was a standard response to Roge's application. When Roge claimed there had been a misunderstanding, the Post did not act on his permanent disability application and kept him on until his position was eliminated.

With regard to (ii), Roge's assertion that the Post explained his termination on the ground that he refused to work Saturday nights, there is no evidence that any such explanation was actually proffered by the Post. In making this assertion, Roge's brief cites to a portion of Amann's affidavit that states only that Roge had told people at the Post that he would rather resign than work Saturday nights. How that statement proves anything in support of Roge's case is not evident.

With regard to what Roge claims are the Post's justifications (iii), (iv), and (v)—lack of work, the restructuring, and disability fraud—we see no inconsistency suggesting pretext. It is undisputed that the Post was undergoing a cost-saving restructuring and that Roge's position was eliminated. Reasons (iii) and (iv) are thus variations, if that, on the same theme rather than separate inconsistent justifications. As discussed *supra,* it is also undisputed that Roge's claim for permanent disability benefits quickly followed by a reversal of position gave the Post reason to believe that Roge had been dishonest. Thus, the Post was not inconsistent in stating that the suspected fraud provided a legitimate basis for its decision to terminate Roge when his position was eliminated as a result of the restructuring. Amann formally based the decision on job elimination, rather than fraud, out of sympathy for Roge, who had been a long-term employee, because the job elimination justification entitled Roge to a benefits package. *Cf. O'Hara v. Mem'l Sloan Kettering Cancer Ctr.,* No. 99 Civ. 2658, 2000 WL 1459798, at *3 (S.D.N.Y. Sept. 29, 2000) ("[I]f, as the evidence indicates, [the employer] honestly believed that Plaintiff was not performing her job properly, it is reasonable that, given Plaintiff's lengthy service to the [employer, it] would consider it more equitable to classify her termination as resulting from the reorganization and thereby protect her pension rights.").

Finally, Roge has not offered any evidence that the Post's justifications, "even if pretextual, served as pretext for age discrimination." *Norville,* 196 F.3d at 98.[2]

---

2. As noted, Roge was not replaced, but, rather, his duties were automated in part and distributed in part among five employees, four of whom were 60, 52, 42, and 40 years old, and one of whom was in his thirties. The 60-year-old assumed Roge's supervisory responsibilities, which Roge himself stated were his primary duties. *Cf. Carlton,* 202 F.3d at 136 (holding fact younger employee hired to fully assume duties of employee discharged three months earlier "tend[s] to refute the reduction-in-force reason for plaintiff's discharge."). Viewing the case as a whole, therefore, no reasonable trier of fact could draw an inference of age discrimination.

We therefore conclude that Roge has failed to create a jury question on the issue of pretext, much less on the issue of pretext for age discrimination.

We have considered Roge's remaining contentions, and we find them to be without merit.

We therefore affirm.