**John MORRIS, Plaintiff,**

v.

**CHARTER ONE BANK, F.S.B., Defendant.**

No. 5:01–CV–1591.

United States District Court, N.D. New York.

April 30, 2003.

Delorenzo Law Firm, LLP (Dana M. Boniewski, Esq., of Counsel), Schenectady, NY, for Plaintiff.

Napierski, Vandenburgh & Napierksi, L.L.P. (Shawn F. Brousseau, Esq., Of Counsel), Albany, NY, for Defendant.

*MEMORANDUM–DECISION and ORDER*

HURD, District Judge.

## I. *INTRODUCTION*

Plaintiff John Morris commenced the instant action against defendant Charter One Bank, F.S.B. ("Charter One") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA"), and the New York Human Rights Law, N.Y. Exec. Law § 296 ("HRL") claiming that he was terminated on account of his age. Defendant now moves for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff opposes. Oral argument was heard on January 24, 2003, in Albany, New York. Decision was reserved.

## II. *FACTS*

Plaintiff was born in 1944. (Def.'s Stmnt. of Material Facts at ¶ 1.) [1] In 1995, at the age of 51, plaintiff was hired by Albank as the Branch Sales Manager of the Johnstown Branch. (*Id.;* Compl. at ¶ 8.) While plaintiff was at Albank, he did not have any individual sales goals. (*Id.* at ¶ 4.) In 1998, Albank merged with defendant Charter One Bank, F.S.B. ("Charter One"). (*Id.* at ¶ 3.) As an employee of Charter One, plaintiff retained his role as Branch Sales Manager. (Compl. at ¶¶ 7–8.)

Charter One's goals for its branches, including the Johnstown Branch, were different than those set by Albank. (Morris Dep. at 70, 72.) Charter One gave its branches goals on an annual basis. (Morris Dep. at 72.) Plaintiff perceived an increased emphasis on sales results. (PSMF at ¶ 9.) He received training which included information regarding the type of available products, the benefits of the

---

**1.** Defendant's statement of material facts (hereinafter the "DSMF") will be cited in those instances where the fact is not disputed between the parties. Where the facts are disputed and properly supported by evidence in the record, it will be so noted. Plaintiff's statement of material facts will be referenced as "PSMF."

product, and things to point out to customers that would be beneficial to them. (Morris Dep. at 90.) The bank did not provide training regarding how to manage sales or how to encourage people to sell. (*Id.* at 91.) However, it did provide training on its computer system. (*Id.*)

During the first year and one-half after the merger, plaintiff continued to work under the supervision of "an Albank person," Rob Geyer ("Geyer"), with whom he worked at Albank. (*Id.* at 68–9, 78.) After the first year plaintiff worked for Charter One, he received a good evaluation from Geyer. (*Id.* at 78.) At his evaluation, Geyer set up goals for the year 2000 that "were higher than the prior year." (*Id.* at 79; DSMF at ¶ 7.) The Johnstown Branch did not meet its goals in the first quarter of 2000 because it was short in the areas of consumer loans and business checking. (DSMF at ¶ 12; Morris Dep. at 85–7.) In the second quarter of 2000, the Johnstown Branch met all of its goals except with respect to its business checking goals. (DSMF at ¶ 14.) In or about June 2000, in addition to the branch goals, Charter One "wanted individual goals assigned to individuals." (Morris Dep. at 80.) The individual goals were implemented in July 2000. (*Id.* at 89.) In or about June 2000, Geyer, resigned. (*Id.* at 92.) In approximately August 2000, his immediate supervisor became Colleen Pickett ("Pickett"). (*Id.*)

In late August 2000, Pickett met with plaintiff regarding his performance evaluation. (Morris Dep. at 92; Def. Ex. D.) She gave plaintiff a copy of his June 21, 2000 performance evaluation that was prepared, in part, by Loretta Chrys ("Chrys"), his second level supervisor. (*Id.*; DSMF at ¶ 19.) The evaluation noted certain performance gaps. (Def.Ex. D.) It noted that consumer loans were at 63% of goal; fee checking was at 97% of goal; and business accounts were at 69% of goal. (*Id.*) Plaintiff received a "great" rating for referrals. (*Id.*) Chrys wrote on the evaluation that "immediate improvement in sales results is required." (*Id.*) The evaluation further noted that plaintiff had strong community involvement and that he was a solid team builder. (*Id.*) He was advised to "maintain [a] positive approach" and focus on a "productive/targeted sales action plan, including off-site effort and [to] capitalize on community involvement." (*Id.*) He received an average rating of 2.1.[2] (Def.Ex. D.) During the evaluation meeting, plaintiff and Pickett "talked a little bit about goals and stuff." (Morris Dep. at 83.) She went over the figures with plaintiff and said that "the year to date goals have to be addressed," and that plaintiff would have to "try to make up the deficiency." (*Id.* at 94.) Pickett and plaintiff discussed the need to improve the gaps in his individual performance. (DSMF at ¶ 46.)

Following the August 2000 meeting with plaintiff, Pickett determined that plaintiff had made no progress in his individual goals. (DSMF at ¶ 48.) Specifically, she believed that as of late September 2000, while the branch was approximately at the same percentage of its goal as it was the prior month, plaintiff had not made any individual progress. (Def. Ex. G at 25.) She also found that plaintiff "wasn't using the technology available to him to support the sales culture." (*Id.* at 26.) Plaintiff was the only branch manager in the region not using the computer system. (*Id.* at

---

**2.** According to the legend accompanying the evaluation, the ratings go from 0 to 3 as follows:

0 = Does not demonstrate this competency

1 = Demonstrates this competency on a limited basis

2 = Demonstrates this competency effectively in a variety of situations

3 = Consistently excels in demonstrating this competency

27.) She believed that plaintiff did not demonstrate any improvement in his use of the computer.[3] (*Id.* at 52.) Pickett saw no areas of improvement after plaintiff's midpoint evaluation was given to him in August. (DSMF at ¶ 50.) On September 22, 2000, plaintiff was issued a written warning which read as follows: (Def.Ex. G.)

> In consideration of a "Development Needed" performance evaluation on your mid-year review requiring immediate improvement in sales results, this write up is notice of Written Warning. Branch performance gaps include consumer loans at 69%, fee checking at 97% and Business Checking at 56%. To date your individual performance gaps include consumer loans at 64%, fee checking at 0%, core accounts at 0% and business checking at 60%.
>
> Minimum individual production levels over the next thirty (30) days are as follows:
>
> | | |
> |---|---|
> | Approved Consumer Loans | $400,000 |
> | Fee Checking Accounts | 5 |
> | Core Accounts | 3 |
> | Business Checking Accounts | 5 |
>
> Minimum individual production levels over the next sixty (60) days are as follows:
>
> | | |
> |---|---|
> | Consumer Loans Booked | $400,000 |
> | Approved Consumer Loans | $400,000 |
> | Fee Checking Accounts | 10 |
> | Core Accounts | 6 |
> | Business Checking Accounts | 10 |
>
> Consequences of not meeting these individual minimum production levels may result in termination. Next scheduled meeting date is October 23, 2000.

(Def.Ex. G.) Plaintiff asked Pickett if termination was a possibility. (DSMF at ¶ 28.) She indicated that it was. (*Id.*)

On October 16, 2000, twenty-four days after receiving the written warning, plaintiff was given a termination letter. He was 56 years old at the time. Pickett and Chrys made the decision to terminate plaintiff's employment. (DSMF at ¶ 49.) The letter read, in pertinent part, that "[t]he purpose of this letter is to notify you that your position has been eliminated as a result of prime staffing, and further to provide you with critical information concerning your severance benefits."[4] (Pl. Ex. A.)

According to plaintiff, at the time of his termination, he had accomplished all of his goals as stated in the written warning, with the exception of the business checking goals. (PSMF at ¶ 55.) He admits that he did not meet his business checking goal for the second quarter of 2000, the fee checking goal for the third quarter of 2000, and that, on paper, he did not open any business checking accounts in the third quarter. (DSMF at ¶¶ 39–41, Morris Dep. at 176.) However, he insists that it only looked on paper as if he did not open any accounts because he gave credit for opening an account to the person who opened it, even if he was instrumental in procuring the account. (PSMF at ¶ 41.)[5]

According to Pickett, plaintiff was terminated on October 16, rather than 30 or 60 days after the written warning, because:

> In my conversations over the telephone and my one on one meetings with John Morris there was no significant progress

---

**3.** Apparently, plaintiff could not open a checking account on the computer system. (Def. Ex. G at 53.)

**4.** At the time of plaintiff's termination, Charter One was implementing a "prime staffing" program to reduce the number of positions that existed in the bank after the merger with Albank. (PSMF at ¶ 52.) The prime staffing program was the result of an economic determination that branches were overstaffed. (DSMF at ¶ 53.)

**5.** Plaintiff does not offer any evidence concerning how many business checking accounts he may have opened in the third quarter of 2000.

toward the 30 day goals and knowing that, then therefore the gap was going to be even larger to make up for the 60 days, and I thought that it would be an opportunity for John to have a severance package and be a good corporate citizen.... John Morris would have been terminated if his lack of progress continued forward and he would not have been afforded a severance package. This just would have ran its course. (Def. Ex. G at 95–6.) By terminating plaintiff in October 2000, Charter One was able to offer him the same severance package that was given to individuals who had their positions eliminated in the prime staffing program. (DSMF at ¶ 56.).

Plaintiff signed a severance agreement that contained a release of all claims, including claims under the ADEA.[6] (*Id.*) The severance package included thirteen weeks of full pay followed by pay that tapered off over the course of 52 weeks. (*Id.*)

After plaintiff's termination, Kathy Collar ("Collar"), who was believed to be in her mid-fifties, was appointed temporary Branch Sales Manager. (PSMF at ¶ 34.) She was then replaced on a permanent basis by Stephen Hallenback ("Hallenback"), who was approximately 38 at the time. (Morris Dep. at 139.) According to Pickett, since January 2001 the Johnstown Branch "has finished in the top tier in the entire corporation and the branch sales manager, as well as the individual performers, have been recognized with awards and accolades for their performance." (Def. Ex. G at 69–70.) In mid 2002, Hallenback was promoted and Collar was made the permanent Branch Sales Manager.

---

**6.** When questioned at oral argument, the attorney for the defendant admitted that for some reason the release agreement was not enforceable.

**7.** Age claims brought pursuant to the HRL are subject to the same analysis as claims

## III. STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

## IV. DISCUSSION[7]

This case once again presents the often debated and difficult task of defining

---

under the ADEA. *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.), *cert. denied*, 534 U.S. 993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). Accordingly, the ensuing discussion addresses plaintiff's ADEA and HRL claims.

the quantum of evidence sufficient for a plaintiff to withstand summary judgment in an employment discrimination case. Discrimination cases pose competing, yet equally legitimate, interests—ensuring an employee's day in court and right to have a jury determine whether he or she was unlawfully discriminated against while protecting employers from the burden and expense of going to trial in those cases where a jury could not reasonably find unlawful discrimination. The task is particularly difficult in discrimination cases because rarely is there the proverbial "smoking gun" in the form of eyewitnesses or a damning paper trail. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To the contrary, discriminatory intent, to the extent it exists at all, usually is secreted deep in the mind of the alleged discriminator. Thus, employment discrimination cases often require a court or a jury to decide what was in the employer's mind or what were the employer's true reasons when it took action against the employee. Without the benefit of some Orwellian mind recorder, courts and juries frequently must make determinations of intent and motivation based on circumstantial evidence. To assist in filtering through and making sense of circumstantial evidence in discrimination cases, the Supreme Court established the now familiar *McDonnell–Douglas* burden shifting framework. *See id.* at 141–42, 120 S.Ct. 2097.

> Under that framework:
> First, the plaintiff must establish a prima facie case of discrimination.... [If he does so] [t]he burden shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.... This burden is one of production, not persuasion; it can involve no credibility assessment.... [If the defendant meets] this burden by

offering admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired because of [the legitimate, nondiscriminatory reason] .... the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s] ... and the sole remaining issue [is] discrimination *vel non.*

*Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097 (internal quotations, citations and alterations omitted).

### A. *Prima Facie Case*

 To establish a prima facie case of age discrimination, plaintiff must demonstrate that (1) he is in the protected age group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of age discrimination. *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000); *Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998). Here, there is no dispute that plaintiff is in the protected age group, that he was qualified for the position, and that he suffered an adverse employment action. Defendant does challenge whether plaintiff was terminated under circumstances giving rise to an inference of age discrimination. Defendant's argument is that plaintiff initially was replaced by an interim Branch Sales Manager of plaintiff's same age, Kathy Collar. Defendant further argues that although Collar was replaced by Hallenback, who is approximately seventeen years younger than plaintiff, Hallenback was later promoted and Collar was appointed as the permanent Branch Sales Manager.

Under these circumstances, plaintiff has presented a prima facie case of age discrimination, albeit a weak one. *See Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 168

(2d Cir.2001); *Schnabel,* 232 F.3d at 87; *Norton,* 145 F.3d at 119. Plaintiff was not immediately replaced by an individual significantly younger than he. Rather, defendant appointed an interim Branch Sales Manager of an age comparable to plaintiff who served in that position for approximately one and one-half months. (Morris Dep. at 137–39.) The fact that plaintiff was immediately, albeit, temporarily, replaced by someone who, in plaintiff's words, was "about the same vintage" does not give rise to an inference of discrimination. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 311–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) ("In the age-discrimination context, such an inference cannot be drawn from the replacement of one worker with another worker insignificantly younger."). Defendant then hired Hallenback, who became the permanent Branch Sales Manager. The fact that the plaintiff was permanently replaced by someone substantially younger than he within two months after his termination presents circumstances giving rise to an inference of discrimination. *Id; see also O'Connor,* 517 U.S. at 311–13, 116 S.Ct. 1307; *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 102 (2d Cir. 2001); *Schnabel,* 232 F.3d at 87. The fact that Collar, who is similar in age to plaintiff, was later appointed as the permanent Branch Sales Manager approximately one and one-half years after plaintiff's termination does take away much of the force, effect and inferences of discrimination that otherwise may be drawn from the fact that plaintiff was replaced by a younger individual.[8] Nevertheless, as stated, plaintiff has set forth a prima facie case of age discrimination.

## B. Legitimate, Non–Discriminatory Basis for the Adverse Employment Action

▇▇▇ Having established a prima facie case of discrimination, it may be presumed that plaintiff was terminated on account of his age. *Jetter v. Knothe Corp.,* 324 F.3d 73 (2d Cir.2003). To negate this presumption, defendant must offer admissible evidence sufficient for the trier of fact to conclude that petitioner was terminated for a legitimate, non-discriminatory reason. *Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097. Defendant maintains that plaintiff was terminated because he was noted to have had poor sales performance, he was warned to improve his sales performance, and he failed to demonstrate sufficient progress towards improving his sales performance. This purported rationale is supported by plaintiff's mid-point evaluation, the written warning and the testimony of his supervisor, Pickett. Accordingly, defendant has satisfied its burden of offering admissible evidence sufficient for the trier of fact to conclude that plaintiff was fired because of a legitimate, non-discriminatory reason (*i.e.,* inadequate sales performance).

## C. Pretext

▇▇▇ Because defendant has set forth a legitimate, non-discriminatory reason for terminating plaintiff's employment, the presumption of discriminatory animus disappears from the case. *Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097. We are, thus,

---

8. In its memorandum of law, defendant asserts that Hallenbeck was promoted after six months on the job. The record suggests, however, the Hallenbeck was promoted one year and six months after serving as Branch Sales Manager. Plaintiff was replaced by Collar in or about October 2000. (Morris Dep. at 137.) Hallenbeck replaced Collar in or about December 2000. (*Id.*) Hallenbeck was replaced as Branch Sales Manager in the summer of 2002, approximately one and one-half years after assuming the position in December 2000. (DSMF at ¶ 58.)

left with "the sole remaining issue [of] . . . discrimination *vel non.*" *Id.* (internal quotation and citation omitted). Plaintiff does not submit any direct evidence of discrimination. One way plaintiff may, nonetheless, attempt to establish discrimination is by demonstrating that "'the employer's proffered explanation is unworthy of credence.'" *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Even if a plaintiff demonstrates a question of fact regarding the veracity of the employer's proffered justification, that does not necessarily mandate a denial of the employer's motion for summary judgment. Rather, the record must be scrutinized for evidence that discrimination was the reason for the employment action. *See Schnabel,* 232 F.3d at 88. As the Supreme Court has stated:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to set forth the actual reason for its decision. . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . . To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56]. . . .

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves,* 530 U.S. at 147–49, 120 S.Ct. 2097 (emphasis in original); *see also Schnabel,* 232 F.3d at 90 ("[W]e decline to hold that no ADEA defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the [ADEA] . . . mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.") (internal quotations and citation omitted).

In the instant case, plaintiff attempts to demonstrate pretext alleging that defendant has given conflicting reasons for plaintiff's termination. According to plain-

tiff, defendant told plaintiff that his position was being eliminated as part of the prime staffing program, but that defendant now claims that he was terminated because of poor sales performance. Plaintiff notes that the October 16, 2000 termination letter states that plaintiff's position is being eliminated as part of the prime staffing program, but that defendant was advertising for a new branch manager during that same period of time, and in fact, other individuals, Collar and Hallenback, were hired to fill plaintiff's former position.

### 1. The October 16, 2000 Termination Letter

■ It is undisputed that the October 16, 2000 termination letter states that plaintiff's "position [was] ... eliminated as a result of the implementation of prime staffing." (Pl.'s Ex. A.) Defendant does not deny that plaintiff's position was not eliminated. Instead, defendant contends that although plaintiff was being terminated because of performance issues, he was included in the prime staffing program and given a "prime staffing letter" so he could receive the severance benefits associated with that program—benefits to which he otherwise would not have been entitled. Plaintiff offers no evidence from which it reasonably may be inferred that this is untrue. In fact, plaintiff admits that because he was terminated in October 2000, defendant was able to offer him the same severance package that was given to individuals whose positions were eliminated in the prime staffing program. (PSMF at ¶ 56.) The evidence that the October 16, 2000 letter is a pretext *for unlawful discrimination* is, thus, weak at best. *See Schnabel*, 232 F.3d at 88; *Norton*, 145 F.3d at 119. Even looking at the evidence in the light most favorable to plaintiff, he offers no evidence tending to suggest that

by issuing a prime staffing letter, defendant was dissembling for unlawful age-based discrimination. Stated otherwise, although the October 16, 2000 letter may not state the true reasons for plaintiff's termination, there is nothing in the record from which it reasonably may be inferred that it was a cover up for unlawful discrimination.[9] *See Fisher v. Vassar College*, 114 F.3d 1332, 1338 (2d Cir.1997) (en banc) ("[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent."), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *see also Reeves*, 530 U.S. at 148, 120 S.Ct. 2097; *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1291–92 (D.C.Cir. 1998).

### 2. Performance Issues

■ Plaintiff also argues that his performance could not have been the true reason for his termination because his performance had not been criticized before Pickett became his supervisor, he met most of his goals, defendant did not permit him sufficient time to meet his goals, and severance benefits were not available to employees who were terminated for cause. "Such a claim is insufficient to meet his burden without some other indicia of discrimination at play." *Evans v. New York Botanical Garden*, 253 F.Supp.2d 650, 659 (S.D.N.Y.2003) (and cases cited therein). The uncontroverted evidence reveals that once Charter One merged with Albank, there was an increased focus on sales and plaintiff's 2000 sales goals were higher than the 1999 sales goals. (PSMF at ¶¶ 7–9.) It also is undisputed that beginning with plaintiff's June 2000 evaluation, his sales performance became an issue. This was before Pickett assumed her role as

---

**9.** To the contrary, it may be reasonably inferred to have been a cover up to afford

plaintiff severance benefits that he readily accepted.

plaintiff's supervisor. The June 2000 performance evaluation, as prepared by Chrys, warned that "immediate improvement in sales results is required." (Def.'s Ex. D.) The evaluation further advised plaintiff to "focus on [a] productive/targeted sales action plan." (*Id.*) The evaluation also indicated that plaintiff needed further development. (*Id.*) Several months later, in late September 2000, plaintiff's sales performance continued to be an issue. On September 22, 2000, Pickett issued plaintiff a written warning "[i]n consideration of a 'Development Needed' performance evaluation ... requiring immediate improvement in sales results." (Def.'s Ex. E.) The warning identified gaps in plaintiff's performance and set certain minimum individual production levels that had to be met over the succeeding thirty and sixty days. (*Id.*) The warning also stated that the "[c]onsequences of not meeting these individual production levels may result in termination." It also is undisputed that Pickett did not witness any improvement in plaintiff's performance since he received his evaluation in August 2000. Plaintiff also admits that although he was terminated only twenty-four days after being given the written warning, and thus, not afforded thirty or sixty days to meet his goals, he did not achieve all of the goals set for him by Pickett.[10] (Pl.'s SMF at ¶¶ 50, 55.) According to defendant, a significant factor in plaintiff's termination in October 2000 was that the Johnstown Branch was not making any improvement in its sales,[11] and

that "there was no significant progress toward the 30 day goals and knowing that, then therefore the gap was going to be even larger to make up for the 60 days, and ... it would be an opportunity for John to have a severance package." (Def.'s Ex. G at 25, 95.) Pickett and Chrys, thus, decided to terminate plaintiff's employment.

Based on the foregoing undisputed evidence, it cannot reasonably be inferred that the reason proffered by defendant for plaintiff's termination (inadequate sales performance) was a pretext for unlawful age-based discrimination. Plaintiff submits no evidence suggesting that defendant did not believe his sales performance to be deficient, that defendant did not act because of plaintiff's sales performance or otherwise tending to suggest that defendant acted because of his age. Plaintiff admits that he never heard any comments suggesting that age may have been a factor in the decision to terminate his employment. (DSMF at ¶¶ 21, 44; Def.'s Ex. C at 192.) Plaintiff also stated at deposition that the only fact that leads him to believe that he was discriminated against on account of his age is that he ultimately was replaced by an individual younger than he. (SMF at ¶ 44; Def.'s Ex. C at 192.) Although plaintiff questions why he was offered severance benefits, the Severance Pay Policy does not preclude payments to persons who are terminated for inadequate performance.[12] (Pl.'s Ex. A.)

---

**10.** Plaintiff met his goals in all areas except business checking. The fact that defendant did not allow plaintiff a full thirty or sixty days to meet his goals may have been unfair or otherwise wrong, but is not evidence of age-based discrimination. *Norton,* 145 F.3d at 119–120 ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating,* for firing people on account on their age.") (emphasis in original).

**11.** Although the Johnstown Branch maintained its prior level of performance during this time, defendant wanted to see improvement in sales performance. (Def.'s Ex. G at 25.)

**12.** The Severance Pay Policy prohibits the payment of severance benefits to persons terminated for cause. Pursuant to the policy, termination for cause includes "termination because of an employee's personal dishonesty, incompetence, willful misconduct, breach of

In short, plaintiff's case rests almost exclusively on the fact that his ultimate replacement was younger than he. *See Norton*, 145 F.3d at 119. The evidence in support of the prima facie case and the claim of pretext is weak. Considering the totality of the circumstances, and viewing the evidence in the light most favorable to the non-moving plaintiff, he is unable to withstand defendant's motion for summary judgment. *See id.* Without any evidence, direct or circumstantial, from which it reasonably can be inferred that age was a factor in the decision to terminate his employment, plaintiff cannot meet his ultimate burden. *See id.*

## V. CONCLUSION

Plaintiff has failed to sustain his ultimate burden of proffering evidence from which a fair-minded trier of fact could reasonably conclude that he was terminated from his position as Johnstown Branch Sales Manager on account of his age.

Accordingly, it is

ORDERED that

1. Defendant's motion for summary judgment is GRANTED; and

2. The Complaint is DISMISSED in its entirety.

The Clerk of the Court is directed to enter Judgment accordingly.

IT IS SO ORDERED.

fiduciary duty involving personal profit, intentional failure to perform stated duties, willful violation of any law, rule, or regulation ... or material breach of any provision of an employee's employment contract." (Pl.'s Ex. A.)

Plaintiff is not purported to have been terminated for any of these reasons. Defendant contends that plaintiff was terminated not for incompetence, but for unsatisfactory performance.