**Louis ALEXANDER, Jr., Plaintiff,**

v.

**COMPUTER SCIENCES CORP., Defendant.**

**No. Civ.3:03 CV 1455 JBA.**

United States District Court, D. Connecticut.

Jan. 11, 2005.

Frank A. Manfredi, Cotter, Greenfield & Manfredi, P.C., Norwich, CT, for Plaintiff.

Kenneth William Gage, Ryan Duffy Costantini, Attorney Day, Berry & Howard, Stamford, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 30]

ARTERTON, District Judge.

This employment discrimination case stems from Defendant Computer Sciences Corporation's decision in September, 2002 to lay off Plaintiff Louis Alexander, Jr., a computer scientist and program manager, who subsequently brought a complaint in Connecticut state court for race and age discrimination. Defendant removed the case to this Court, *see* Petition for Removal [doc. # 1], pursuant to 28 U.S.C. § 1441, and now brings a motion for summary judgment [doc. # 30] under Fed.R.Civ.P. 56(b). For the reasons that follow, Defendant's motion is denied.

### I. FACTUAL BACKGROUND

The following facts are drawn from the parties' Local Rule 56(a) statements and supporting exhibits. Disputed facts are noted *infra*.

Plaintiff Louis Alexander is "a black male born January 23, 1949." Alexander Aff. ¶ 3. He holds a Master's degree in engineering, a Master's of Business Administration, and several professional certifications. In October, 2000, he began

working for Computer Sciences Corporation ("CSC") as a computer scientist. Initially, he was assigned to CSC's Project Management Office for United Technologies Corporation, where he worked under the supervision of Karen Bonola for a few months, after which Lonnie Henegar became his supervisor. William Negrone became his supervisor in mid–2001.

In May 2001, Alexander received his first job performance evaluation from Henegar and Negrone. The overall rating was a 4, meaning he needed improvement. Alexander challenged this rating successfully through CSC's human resources department, eventually getting his performance rating increased to a 3 and obtaining a merit-based salary increase. Alexander asserted that his negative performance evaluation was unjust and resulted at least in part from race and age discrimination and nepotism on the part of his supervisors.

Edna Colon was the individual who was first in charge of investigating Alexander's complaint about his employment rating. She believed that "Mr. Alexander was showing much more positive information [than reflected in the original performance appraisal] and that Mr. Negrone was not showing sufficient information otherwise." Colon Dep. at 20. On June 19, 2001, Carl Bishopric, a more senior member of the human resources department, conducted an independent review of Negrone's performance evaluation, found it insufficiently documented, and recommended that it be changed to a 3. Pl. Table of Contents [doc. # 44], Ex. 14. Eventually, senior human resources manager Jay Crowley became involved with the investigation and also concluded that Alexander's evaluation should be raised to a 3. Negrone finally edited the evaluation and upgraded Alexander's rating to a 3 after a series of prompts by Colon.

During the course of discussing the change in the performance evaluation, in a meeting between Alexander, Negrone, and Colon, Negrone referred to Alexander as an "old .grey fox." Alexander told Colon after the meeting that he perceived the comment as a slur and was offended, and Colon immediately talked to Negrone, who asserted that he meant it as a compliment. Colon Dep. at 42. Colon testified that she did not believe Alexander overreacted. *Id.*

Crowley eventually concluded that Alexander had not been the victim of race or age discrimination in Negrone and Henegar's employment evaluation. However, the extent and thoroughness of Crowley's investigation is disputed. Crowley asserts that he did a complete investigation, Crowley Aff. at ¶ 6, and testified that he spoke with Alexander concerning his perceptions of Negrone. Crowley Dep. at 57. However, Alexander states that Crowley never interviewed him concerning his claims of race or age discrimination. Alexander Aff. ¶ 15. Crowley admitted that he never documented whether he asked Negrone himself about any possible race or age bias, even though Crowley thought it would have been important to do so. Crowley Dep. at 58. Crowley stated that when he reviewed his findings with Alexander, Alexander "concurred at the time with my conclusion that there was no evidence of discrimination or nepotism." Crowley Aff. at ¶ 6. However, Alexander maintains that he consistently asserted that was the victim of race and age discrimination.

Alexander "always felt [negrone] treated me differently than white employees. He would schedule me for 30 minute meetings and then cut them short after a minute or two; he appeared not to be able to stay in the same room as me and would walk out into the hall while speaking with me. He gave me the feeling that he didn't want me around ... I never saw Mr. Negrone treat

white employees the way he treated me." Alexander Aff. at ¶ 32–33.

In January 2002, after the performance evaluation dispute was concluded, Alexander became program manager in charge of a project called Active Directory Program for United Technologies, one of CSC's clients. This project involved updating or replacing computers to run Windows 2000 so that client-specific software could be installed. In May 2002, Alexander was also assigned to be program manager for Server Refresh, which was essentially a subset of Active Directory and involved replacing or updating servers for United Technologies. Alexander accepted the second assignment. His supervisor for Server Refresh was Hennig Kerger, who was the program manager for "Mega-deal Server Refresh," meaning he was responsible for that project across several United Technologies businesses.

Alexander's dealings with Kerger are disputed. Alexander states that in early May 2002, Kerger asked him to work on Server Refresh. Because Alexander was scheduled to be in New York that day in connection with Active Directory, he was unable to do the work but states that he never asked to be relieved of the project altogether, and continued working on Server Refresh throughout the summer of 2002. Alexander Aff. ¶¶ 25–27. In contrast, Kerger testified that Alexander asked to be removed from one of the two projects because he thought it was too heavy a workload. Kerger Dep. at 19–21. Kerger stated he consulted with Negrone, who appointed Brian Bergen to take Alexander's place as project manager of Server Refresh. *Id.* at 21. It is undisputed that while Alexander was in charge of Server Refresh the project was rated "green," meaning on schedule and within budget, while under Bergen's leadership the project was rated "yellow," meaning behind schedule or over budget.

On September 27, 2002, Alexander was laid off. The decision was made by Negrone, who testified that three criteria generally factored into his layoff decisions: performance, billable hours, and criticality. He testified that Alexander's performance rating of 3 was equivalent to that of many other project managers, and Alexander was selected for layoff because he "no longer had a critical project or billable hours." Negrone Dep. at 73. However, Negrone also testified that both Active Directory and Server Refresh were critical projects. *Id.* at 70. Negrone's testimony concerning whether and when Active Directory was a billable project is equivocal. *Id.* at 67–70. Additionally, Negrone testified that Alexander's alleged unwillingness to take on both the Active Directory and Server Refresh projects was a factor, because he believed those projects needed to be consolidated under one manager. *Id.* at 62.

After Alexander was laid off, he was replaced by Brian Bergen, a white male who was 29 years old at the time and who had less formal education than Alexander. Bergen Dep. at 7.

While searching for another job in October, 2002, Alexander discovered that CSC was advertising for a project manager position in its East Hartford office, where Alexander previously had been employed.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A party seeking summary

judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–1061 (2d Cir.1995) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Id.* (citations omitted).

"If reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain [ ] summary judgment." *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir.1997) (internal citations, alterations and quotations omitted). The Second Circuit has cautioned district courts to be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997).

## III. DISCUSSION

### A. Title VII and ADEA Framework

As the parties agree, this employment discrimination case should be analyzed under the familiar *McDonnell Douglas/Burdine* three-prong burden-shifting framework. Under that framework, Alexander first must establish a *prima facie* case of discrimination on account of race and/or age. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). To do so,

Alexander must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *See e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). "A plaintiff's burden of establishing a prima facie case is de minimis." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.2001). Defendants do not dispute that Alexander can prove the first three prongs: he is a black male who was over the age of 40 at the time of his termination; he was a computer scientist qualified for the position of program manager; and he was laid off. No one particular type of proof is required to satisfy the fourth element; it may take a variety of forms. *Abdu–Brisson*, 239 F.3d at 468.

Such proof shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations, quotations, and alterations omitted). Defendant's burden is satisfied if the proffered evidence " 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

If the employer articulates a neutral reason for the plaintiff's termination—such as a reduction in force—the burden shifts back to the plaintiff to show pretext. That is, the plaintiff "may attempt to establish

that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

### B. Analysis

#### 1. Prima Facie Case

Defendant CSC first argues that Plaintiff Alexander cannot make out a prima facie case because he cannot bring forth any evidence of race or age discrimination under the fourth prong of the test. Specifically, CSC argues that Alexander cannot point to similarly-situated younger or white employees who were treated differently. As the Second Circuit has made clear, however, evidence of disparate treatment is not required to fulfill the fourth prong of the test. *Abdu–Brisson*, 239 F.3d at 468. If such evidence were required in every employment discrimination case, an employer could "effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated employees are victimized." *Id.* To avoid that "grotesque scenario," a variety of evidence may satisfy the plaintiff's burden under the fourth prong, "including, but not limited to: 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms . . .' " *Id.* (*quoting Chambers*, 43 F.3d at 37).

■ Alexander has satisfied that burden. He has offered evidence that after he was terminated, CSC continued to advertise his position on the internet, and that after he was terminated a younger white male assumed responsibility for his former tasks. Alexander has also presented undisputed evidence that his supervisor, Negrone, referred to him as an "old grey fox." While Defendant asserts that Negrone's statement was meant as a compliment, this is not the only inference that could be drawn and a reasonable juror could find it to be an age-based and/or conceivably a race-based slur. Defendant argues that the "old grey fox" comment was merely a stray remark, and thus nonactionable. However, viewing this comment in the full context of the evidence in this case, including Alexander's observations that Negrone had a different attitude toward him compared to white employees and gave Alexander an unjustified negative employment evaluation, which he was later required to upgrade, a reasonable juror could conclude that Negrone's remark was not simply a stray comment, but a manifestation of unlawful bias.

The above evidence suffices to establish plaintiff's *prima facie* case and Defendant's motion for summary judgment on this basis is denied.

#### 2. Pretext

Plaintiff does not dispute that Defendant has offered evidence of a legitimate nondiscriminatory reason for Alexander's termination, namely, a reduction in force necessitated by a business slump. Thus the analysis turns to whether Defendant is entitled to summary judgment on its claim that Alexander cannot prove that CSC's proffered reason was pretextual.

Plaintiff has offered evidence that calls into question whether Negrone's reasons for selecting Alexander for layoff were the real and/or the only motivating reasons. The issues of whether Alexander refused to take on responsibility for both Active Directory and Server Refresh, whether Active Directory and Server Refresh were critical or billable—all factors claimed by Negrone as the basis for his decision to lay off the plaintiff—are disputed. Although

Kerger corroborates Negrone's version of Plaintiff's refusal, Alexander disputes that he refused to lead both projects and states he actually continued working on Server Refresh even after Brian Bergen came in.

Defendant argues that *Roge v. NYP Holdings, Inc.,* 257 F.3d 164 (2d Cir.2001), compels a different conclusion. In *Roge,* the Second Circuit concluded that the plaintiff had not proved that his termination during a reduction in force was a pretext for age discrimination when the company offered evidence that it selected the plaintiff for layoff in part because it believed in good faith that the plaintiff had committed disability fraud. *Id.* at 169. Defendant asserts that Negrone's good faith belief that Alexander refused the Server Refresh project shields CSC from liability, even if it was untrue. Defendant reads *Roge* too broadly. In Roge's case, the disability "forms on their face" indicated that Roge may have committed fraud by filing an application for permanent, rather than temporary, disability. *Id.* Here, defendant offers no written evidence memorializing Alexander's alleged decision to withdraw from the Server Refresh project; the only evidence is the disputed testimony of Kerger and Alexander, requiring a credibility determination. Reasonable jurors could conclude that Negrone's reliance on Kerger's oral report without any investigation as to its truth or accuracy illustrated Negrone's effort to find a pretextual reason to discharge Alexander, particularly as Negrone had been required to upgrade his performance evaluation of Alexander as a result of Alexander's complaint.

Unlike *Roge,* where there was no evidence of pretext because the employer's "stated justifications ... are not inconsistent," *id.* at 170, Negrone's testimony appears inconsistent. At one point he claims to have decided to lay off Alexander be-cause Alexander's projects were not critical, or at least not in a critical phase in September, 2002, but he also testified that Active Directory and Server Refresh were both critical to CSC's business. Negrone Dep. at 69–70. Negrone further testified that another factor in his decision was that neither Active Directory nor Server Refresh was billable to a client in September 2002 but he later stated that the design phase of Active Directory was billable, and he was unsure whether the design phase was complete at the time Alexander was laid off. *Id.* at 69.

Finally, in *Roge* there was no allegation that the plaintiff's job was advertised after the plaintiff was laid off, in contrast to the proffered evidence here of Defendant's internet job posting listing Plaintiff's job within a month of his layoff date, notwithstanding Defendant's protest that this posting was inadvertent and no applicants were interviewed.

■ Given the contradictions in Negrone's testimony, and the additional factors distinguishing this case from *Roge,* the Court concludes that the proffered evidence shows the existence of genuine disputes of material fact relating to the circumstances and reasons for Negrone's selection of Plaintiff Alexander for layoff, without regard to the weight to which the evidence may be entitled. The "issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253,

288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## IV.  CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [doc. # 30] is DENIED.  A supplemental scheduling order will issue.

IT IS SO ORDERED.